UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

T.K.,

    Plaintiff,

v.

RED ROOF INNS, INC.,
RED ROOF FRANCHISING, LLC,
and VARAHI HOTEL, LLC,

    Defendants.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

### 1.

T.K. is a victim of sex trafficking at the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia 30080. From 2014 through 2017, T.K. was sold for sex at the hotel starting when she was a child of only 16. Given the nature of the case, Plaintiff is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.

### 2.

At all times relevant to this complaint, Defendants Red Roof Inns, Inc. ("RRI"), Red Roof Franchising, LLC ("RR Franchising"), and Varahi Hotel, LLC ("Varahi"), (collectively, "Defendants") owned, managed, supervised, operated,

oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Red Roof Inn Atlanta – Smyrna/Ballpark located at 2200 Corporate Plaza SE, Smyrna, Georgia, 30080 ("Red Roof"), from which they benefited financially.

3.

Defendant Red Roof Inns, Inc. is a corporation authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on Red Roof Inns, Inc. by serving its Registered Agent: Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

4.

Defendant Red Roof Franchising, LLC is a limited liability company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on Red Roof Franchising, LLC by serving its Registered Agent: Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

5.

Defendant Varahi Hotel, LLC is a limited liability company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on Varahi Hotel, LLC by serving its Registered Agent: Bharat Patel, 2200 Corporate Plaza, Smyrna, Georgia 30080.

2

6.

Defendants have been properly served with process in this action.

7.

Jurisdiction and venue are proper as to Defendants.

8.

This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. § 1595(a).

9.

Defendants knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiff's trafficking. Defendants knew because:

(a) Defendants knew about Plaintiff while she was sold for sex at the Red Roof Inn;

(b) Defendants' employees knew of and permitted sex trafficking and prostitution to occur at the Red Roof Inn;

(c) Defendants knew about several other sex trafficking victims at the Red Roof Inn before, during, and after Plaintiff;

(d) Defendants knew about frequent and similar crimes occurring at the Red Roof Inn;

3

(e)    Defendants knew about the reports of Red Roof Inn guests regarding sex trafficking and prostitution-related activities; and

(f)    Defendants had knowledge of sex trafficking generally in the Atlanta area and at the Red Roof Inn specifically.

10.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

11.

Sex trafficking and prostitution were common occurrences at the Red Roof Inn and Defendants chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendants are liable to Plaintiff for their actions and failure to act. Defendants' liability to Plaintiff is straightforward:

(a)    The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person

4

knew or should have known has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendants (i) rented a room to Plaintiff's trafficker so Plaintiff could be violently sold for sex at the hotel, and (ii) did so despite what they knew or should have known about Plaintiff being a victim of sex trafficking at the hotel. As a result of Defendants' conduct, Plaintiff suffered physical and mental harm, and Defendants are liable to Plaintiff for the damages arising from those harms under the TVPRA.

(b) The Red Roof Inn constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Red Roof Inn, causing her substantial harm.

(c)    Because Plaintiff was a child when she was trafficked at the Red Roof Inn, and because Defendants knowingly facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to Plaintiff for the substantive violation of 18 U.S.C. § 1591.

12.

At all times relevant hereto, Varahi owned, operated, maintained, controlled, and managed the Red Roof.

13.

RRI and RR Franchising are the franchisors of the Red Roof brand and are providers of guest lodging facility services, including at the Red Roof.

14.

Varahi, RRI, and RR Franchising each knowingly received a financial benefit of some kind, whether revenue or royalty, from each room rental at the Red Roof, including from the rooms in which Plaintiff was trafficked.

15.

RRI and RR Franchising are joint venturers who control the operation of the Red Roof and function as a single entity. RRI and RR Franchising are interrelated companies that share principal places of business, jointly own the data derived from the operation of the Red Roof, share funds generated by the Red Roof, and have

rights of mutual control over the Red Roof and each other.   RR Franchising had no employees and conducted no business at the Red Roof independent of RRI.

16.

RRI and RR Franchising control the day-to-day operations of the Red Roof by mandating, among other things: the hours of operation for the Red Roof, conformity to RRI's requirements on room rates and on-site safety and security programs, participation in RRI's marketing campaigns and promotions, utilization of RRI's reservation system RediStay, and participation by all Varahi employees in RRI's RED Advantage Training Program and/or RRI's Field Training Program.

17.

RRI and RR Franchising jointly control the day-to-day operations of the Red Roof. RR Franchising enters into contracts with franchisees, including Varahi, that incorporate and bind Varahi to many other documents, contracts, and programs, which are in turn controlled by RRI. These contracts and programs include the Franchise Agreement, the Standards Manual, the RediCard Member Program, Reservation System and Marketing Program, the Volume Plan Plus Program, the RediBill Program, the RediStay program, and the Red Advantage Training Program, among others, which provide *mandatory* policies, procedures, and operational practices that control nearly every aspect of the Red Roof's daily operation. These documents are collectively referred to as the "Franchisor Contracts."   Varahi's employees must

7

comply with the terms of the Franchisor Contracts and the numerous policy documents referenced therein.

18.

Together, RRI and RR Franchising jointly control, among many other hotel functions at the Red Roof, employee and management training and supervision; employee interaction with guests at the hotel; all food, supplies, products, and amenities available in the hotel; the hotel's online reputation management; guest reservation and booking, including check-in and check-out, rates and room inventory, front desk record-keeping, and other essential tasks. Through the Franchisor Contracts, RRI and RR Franchising impose hundreds of mandatory requirements and prohibitions on Varahi.

19.

Through the Franchisor Contracts, RRI and RR Franchising require Varahi to submit to their daily control by requiring compliance with the Standards Manual, the Reservation System and Marketing Program, the property management systems, guest programs, and central reservation platform. These programs dictate what hotel staff say to every hotel guest on a daily basis.

20.

RRI also requires Varahi's employees to submit to additional training and to promote, manage, and operate the RediStay program for the benefit of RRI. RRI

reaps valuable guest data and increased profits from the program for RRI. If Varahi's employees do not operate the program to RRI's satisfaction, RRI imposes fines on Varahi.

21.

RRI and RR Franchising jointly train every Red Roof employee through the RED Advantage Training Program and Field Training Program, which cover every aspect of the Red Roof's operation. According to the Franchise Contracts, this training is mandatory. At their option, RRI and RR Franchising may require franchisees, including Varahi, to pay for further mandatory remedial training from RRI and RR Franchising.

22.

Pursuant to the Franchisor Contracts, RRI and RR Franchising reserve the right to discontinue and terminate their relationship with Varahi if RRI and RR Franchising determine that the Red Roof does not meet their quality standards, as measured by regular quality assurance and other inspections performed by RRI and RR Franchising.

23.

RRI and RR Franchising exert control over the Red Roof's security operations and require employees of the Red Roof to send RRI incident reports whenever a security incident, including arrests, occurs at the property. RRI and RR Franchising

also required Varahi to consult with them before speaking with the media regarding any safety and security incidents.

24.

RRI maintains an extensive Online Reputation Management System that closely monitors and scrutinizes social media references, online reviews, complaints, news reports, and other references to its hotels, including the Red Roof, in real time. Through this system, RRI monitors all publicly-available reviews of the Red Roof, publishes online reviews on its own website, https://www.redroof.com/property/ga/smyrna/RRI088#trip-advisor-section, receives customer surveys and complaints directly, manages feedback from those communications, and monitors safety threats, police reports, and news articles involving the Red Roof. Further, RRI represents that "our president receives all of our Tripadvisor Reviews to his email daily." RRI analyzes this data and delivers analysis, feedback, direction, and ultimatums to hotels and franchisees daily. For example, RRI gave Varahi a time limit to have its employees respond to online complaints or face a fine.

25.

RRI and RR Franchising accepted and ratified the conduct of Varahi and its employees, agents, and representatives as alleged herein.

10

26.

Based upon the factual assertions outlined in paragraphs 12-25 and throughout this Complaint, RRI and RR Franchising are directly liable for their own acts and omissions and directly and vicariously liable for the acts and negligence of Varahi as discussed herein.

27.

All Defendants are directly and vicariously liable for the acts and negligence of Varahi's agents and employees discussed herein.

28.

Whenever reference is made in this complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## I.    Sex Trafficking Allegations

29.

In 2011–2012, Cobb County police notified a Red Roof employee and general manager of the Red Roof that sex traffickers had paid a former general manager and a hotel employee to act as lookouts.  Despite this knowledge, the Red Roof Defendants did nothing.

11

30.

At the time of, and prior to, Plaintiff's trafficking at the Red Roof, hotel employees acted as lookouts for sex traffickers, alerting them to the presence of law enforcement. This occurred in several specific incidents to numerous other victims who have previously testified regarding their sex trafficking at the Red Roof.

31.

Jay Moyer, Vice President of Operations for RRI, in addition to various other RRI employees, regularly visited the Red Roof to inspect the hotel and discuss the hotel's revenue and performance. Mr. Moyer frequently stayed at the Red Roof for 2–3 nights at a time, several times each year. During these stays, Mr. Moyer had the opportunity to personally observe the rampant sex trafficking at the Red Roof. Employees have testified that Mr. Moyer ultimately refused to stay overnight at the Red Roof anymore because of the open and obvious criminal activity, including but not limited to sex trafficking, that he observed while at the Red Roof.

32.

From December 2012 through December of 2017, Vickie Lam, a RRI employee, inspected the Red Roof several times a year on behalf of RRI. During these inspections, Ms. Lam observed the conditions of the Red Roof, including the rampant sex trafficking and prostitution occurring at the Red Roof.

12

33.

On or about December 4, 2015, a hospitality industry executive and anti-trafficking advocate spoke with RRI's then-President and CEO, Andrew Alexander, on the telephone, describing the rampant and ongoing commercial sex trafficking at the Red Roof. In this call, the hospitality industry executive identified—by name—a suspected sex trafficker who was operating at the Red Roof and who was listed on the Georgia Sex Offender Registry and who had a lengthy criminal history of sex crimes involving minors. The hospitality industry executive told Mr. Alexander this was "[o]ne example of a Red Roof Inn appearing to be involved in trafficking." The hospitality industry executive then emailed Mr. Alexander additional details of the sex trafficking at the Red Roof, including online articles detailing sex trafficking at the Red Roof (including articles from the ATLTrafficking website, described below), and supplied him with information on how to prevent sex trafficking. Mr. Alexander's only response to this information was to have RRI's general counsel, George Limbert, call the hospitality industry executive to find out who owned the website where the articles were published.

34.

The hospitality industry executive then sent Mr. Limbert the same information previously sent to Mr. Alexander and again asked when the company would take action to address the open sex trafficking at the Red Roof.

13

35.

On or about December 22, 2015, weeks after the hospitality industry executive's first communication with Mr. Alexander, the hospitality industry executive again emailed him, this time copying Mr. Limbert, and alerting both of them that the previously identified trafficker was seen at the location again. Among other things, the email reported that the trafficker "was seen outside your manager's office last night [at the] Red Roof Inn mentioned in the report [the Red Roof]. His background is very clear[,] and he appears to be using your hotel regularly and is quite friendly with your manager. … I hope Red Roof takes action on this sad situation." RRI again did nothing.

36.

Defendants were also notified of the existence of at least two public websites devoted specifically to warning members of the public about drug activity, sex trafficking and prostitution at the Red Roof. The "Red Roofie Blog" began in 2014 and warned of drug activity and prostitution at the Red Roof. It also warned travelers, especially families, not to stay at the hotel. Another website, www.atltrafficking.com ("ATLTrafficking"), highlighted instances of sex trafficking at hotels in Atlanta and published more articles about the Red Roof than any other hotel in the city.

37.

Defendants had actual or constructive knowledge of publicly available online reviews of the Red Roof, reporting widespread prostitution and crime occurring at the hotel, including:

a. A July 7, 2013 review stating "Prostitutes everywhere .... There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window.  It was hard to sleep to say the least.  The only security I felt was the fact our dog was with us.  Don't stay here!!!"

b. An August 12, 2014 review stating "PROSTITUTION – COCK ROACHES – AND DOG POOP! Deluxe ROOM DO NOT GO THERE!!!!! My worst experience ever! Saw prostitution, dogs pooping outside, loitering, dead cockroaches in my room.  I askd thm 2 come get it up th clerk said he could "bring me a broom!"[] NOT! ... I wouldn't send my enemy here! Unless you want crackheads and prostitutes and don't mind ...."

c. Another August 2014 review stating "This hotel is unsanitary and a hotbed for criminal activity.... Dirty pillow cases, blood on the floor, bugs, cigarette burns everywhere, prostitutes, and drug activity right

15

outside our door, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less."

d. A September 2014 review, stating "I am in the room right now scared! ... I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars? Im a dime baby you no im worth more than that!" Then the traffic throughout the day.... its a drug and prostitute headquarters. Im a young male well over 6ft tall and fear for my safety! I smoke cigarettes religiously and have quit and made a promise to never do it again because I had to stand outside and witness these acts and wonder if I would be jumped! … oh and now I hear shamika making a quick buck in the next room, classy!"

e. A September 7, 2014 review stating "Nothing but a dope and prostitution den!! The room was nasty .... Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car."

f. A July 2015 review stating "Bed bugs crawling on top of the bedding, prostitutes roaming the facility, drug deals taking place in the walkways, loitering in the office people sitting ... unsavory characters every

16

where [sic], not recommended for anyone. If it were possible to give less than 1 star I would needless to say, this review was captured in less than 15 minutes at the establishment. BEWARE!!"

g. An August 2015 review stating "DO NOT STAY HERE. Terrible place to stay…. Prostitutes and drug dealers roam the parking lot. There are at least 5 people on the parking lot all hours of the night."

h. An August 2015 review stating "Ok so I get there, she tells me system down I seen people just hanging out in lobby. Just sitting smelled really funny, housekeepers steal and look real shady. Needs more cameras lots of prostitution going on and I know the staff know. They will call peoples room when the police come and say don't answer. I seen this happen to me .... This hotel is a trap spot for $60 do not put your life at risk! BaD AREA!!!!!!"

i. A May 17, 2016 review, stating "Ok to start do not stay here .... There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises. … The 1st day of me checking in I found blood on the bathroom door, walls and floor."

38.

The sex trafficking and prostitution at the Red Roof was open and obvious. It was a common occurrence at the Red Roof for girls and women to hang over

17

balconies and stand in open doorways to advertise their availability for commercial sex. More than a dozen other sex trafficking victims have testified as to their trafficking at this same Red Roof Inn.

39.

Room doors at the Red Roof Inn open from the rooms onto outdoor breezeways facing the hotel's parking lot, making trafficking activity, violence, police activity, and other activity in or around room entrances visible from the parking lot and easily observed by hotel employees.

40.

So many buyers came to the Red Roof to purchase commercial sex that traffickers took to directing car traffic in the parking lot to increase efficiency and to maximize profits. Hotel employees at the Red Roof witnessed and permitted this activity.

41.

Hotel employees saw traffickers beat sex trafficking victims in the public parking lot and use force to recruit additional victims.

42.

Red Roof security guards, who were supposed to prevent and report illegal activity, instead partied with guests—including traffickers—drinking and using drugs with them.

18

43.

At least one Red Roof security guard purchased sex from a woman being trafficked at the location while he was on duty.  Red Roof security guards also purchased drugs from the traffickers at the Red Roof.

44.

A Red Roof hotel employee estimated that from roughly 2010 through at least 2016, a significant portion of the location's business—at times a majority—came from renting hotel rooms to sex traffickers and prostitutes.  The same hotel employee also estimated that persons selling drugs and commercial sex at times constituted 50% to 75% of the hotel's occupancy.  At any given time, the same hotel employee estimated there were 10 to 12 different traffickers operating at the Red Roof, many of whom controlled more than one victim and some of whom controlled 4 to 5 victims at a time.

45.

While being trafficked at the Red Roof, Plaintiff was required to see roughly five buyers of commercial sex every day.  Many other sex trafficking victims at the Red Roof also saw multiple buyers of commercial sex each day while being trafficked there.  Plaintiff's trafficker also sold as many as five other victims at the same hotel while Plaintiff was trafficked there, including at least one other minor.

19

46.

A Red Roof hotel employee estimated that during the time he worked at the location—from 2008 through 2016—there were often more than 100 buyers of commercial sex at the Red Roof every day.

47.

Plaintiff was trafficked for sex at the Red Roof on multiple visits from 2014 through 2017.  Some of Plaintiff's stays at the Red Roof would last months at a time, others would last several days.

48.

Because the Smyrna Red Roof was such a hotbed of minor sex trafficking activity, two other victims of minor sex trafficking at the Smyrna Red Roof witnessed T.K. at the hotel and knew she was being sold for sex there.

49.

While she was trafficked at the Red Roof, Plaintiff exhibited numerous well-known and visible signs of a sex trafficking victim in the common areas, of which Defendants knew or should have known, including her inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control by her trafficker.

50.

While she was trafficked at the Red Roof, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which Defendants knew or should have known.

51.

While Plaintiff was trafficked at the Red Roof, many older men visited the sex traffickers' rooms each day, each for short periods of time. Defendants knew or should have known that the number of daily, older male visitors to the room was obviously indicative of sex trafficking, and Defendants negligently failed to control or monitor the frequent male visitors.

52.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing.

53.

Employees at the Red Roof accommodated and were familiar with Plaintiff's trafficker.

54.

Defendants knew or should have known that the Red Roof was utilized for sex trafficking as Defendants, at all relevant times, posted signs at the front desk and on the night window indicating that no refunds would be given on rooms after fifteen

21

(15) minutes.  This policy is also well publicized in online reviews.  There is no legitimate reason for such a policy other than to prevent buyers from seeking refunds after having sex with victims of sex trafficking.  As specific evidence, the signs posted in the lobby of the Red Roof appears as follows:



22



55.

RRI and RR Franchising require Varahi to send all crime and incident reports concerning the property directly to RRI.  All Defendants knew or should have known of sex trafficking and other criminal activity existing at the Red Roof prior to Plaintiff's sex trafficking.

56.

Defendants had actual and constructive knowledge of sex trafficking and other criminal activity existing on the property and in the surrounding area prior to Plaintiff's sex trafficking. Defendants knew or should have known of violent crimes occurring on their premises and approaches.

23

57.

As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

58.

In addition to all of the above, the police frequently investigated and made arrests for sex, drugs, and gang crimes at the Red Roof Inn. Much of this activity either alerted or should have alerted Defendants to the hotel's rampant sex trafficking, prostitution, and sex crime problem.

59.

Defendants and their employees knew or should have known that obvious sex trafficking, including T.K.'s sex trafficking, was occurring at their property, at times with the assistance of their employees.

60.

Defendants knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

## II.    Defendants' knowledge of sex trafficking generally.

61.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

24

62.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Red Roof Inn. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiff.

63.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[1] and as "the number one city for child sex trafficking."[2]

---

[1] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited May 26, 2026).

[2] *Id.*

64.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

65.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[3] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[4] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming

---

[3] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited May 26, 2026).

[4] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

into contact with motels at some point" during their exploitation.[5] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[6]

66.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[7] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[8]

67.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the

---

[5] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polaris-project.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited May 26, 2026).

[6] *Id.* at 23.

[7] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

[8] *Id.* at 19.

27

Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[9]

68.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a) establish corporate policy and procedures against sexual exploitation of children;

(b) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f) report annually on the company's implementation of Code-related activities.

---

[9] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited May 26, 2026).

69.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

70.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct house-keeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a)     persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)     persons who lack freedom of movement or are constantly monitored;

(c)     persons who have no control over or possession of money or ID;

(d)     persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)     requests for room or housekeeping services (additional towels, new lin-ens, etc.), but denial of Motel staff entry into the room;

(f)     the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

29

(g)    extended stay with few or no personal possessions in the room;

(h)    excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)    the same person reserves multiple rooms;

(j)    a room is rented hourly, less than a day, or for an atypical extended stay;

(k)    attempts to sell items to or beg from patrons or staff;

(l)    cars in the parking lot regularly parked backward, so the license plates are not visible;

(m)    loitering and solicitation of male patrons;

(n)    waiting at a table or bar and picked up by a male (trafficker or customer);

(o)    persons asking staff or patrons for food or money; and

(p)    persons taking cash or receipts left on tables.

71.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiff's case, the Red Roof Inn, for a fee, provided this market for Plaintiff to be confined and sold.

30

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

72.

Plaintiff incorporates the paragraphs above as if fully restated herein.

73.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

74.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Red Roof Inn, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Red Roof Inn, Defendants knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

75.

Defendants participated in a hotel venture and knew or should have known that their operation, ownership, management, franchising, or control of the Red Roof Inn violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the hotel. Defendants also participated in a venture by

31

actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at the Red Roof Inn.

76.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Red Roof Inn. Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at Defendants' hotel.

77.

The venture in which Defendants participated was in or affecting interstate commerce.

78.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Red Roof Inn. Defendants knew or should have known of this participation.

79.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity

occurring at the Red Roof Inn.

80.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

81.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants participation in this venture.

82.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

83.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

84.

Plaintiff incorporates the paragraphs above as if fully restated herein.

85.

Plaintiff was under the age of 18 when she was trafficked at the Red Roof Inn.

86.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Red Roof Inn.

87.

As described herein, Defendants knowingly benefitted from participating in a venture that they knew or should have known engaged in an act of sex trafficking at the Red Roof Inn, including the harboring and other trafficking activities which harmed Plaintiff.

88.

Plaintiff suffered injuries as a result of Defendants' violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

89.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT III**
**NUISANCE**

90.

Plaintiff incorporates the paragraphs above as if fully restated herein.

91.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt,

34

inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

92.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

93.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

94.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist,

and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

## Public Nuisance

### 95.

The Red Roof Inn's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

### 96.

The Red Roof Inn caused or contributed to a blighting effect on the surrounding community, so that the Red Roof Inn negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Red Roof Inn, although the effects on each person may have varied.

### 97.

The illegal prostitution and sex trafficking nuisance occurring at the Red Roof Inn had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

### 98.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Red Roof Inn caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendants' nuisance hotel and suffered damages to her

health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiff for all such damages.

## Public Nuisance Per Se

99.

The Red Roof Inn constituted a statutory nuisance per se under Georgia law because Defendants knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the Red Roof Inn, including sex trafficking.

100.

A business where illegal practices are permitted constitutes a nuisance.

101.

A business, like the Red Roof Inn, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

102.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Red Roof Inn that permitted illegal sexual activity to occur there.

103.

Defendants are liable for nuisance (public nuisance and/or per se public nuisance) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious

condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## DAMAGES

104.

Plaintiff incorporates the paragraphs above as if fully restated herein.

105.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiff sustained physical injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

    (a)    Physical injuries;

    (b)    Past, present and future conscious pain and suffering;

    (c)    Loss of enjoyment of life;

    (d)    Mental anguish and emotional distress;

38

(e) Incidental expenses;

(f) Consequential damages to be proven at trial.

106.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

107.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68, 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

(a) Process issue as provided by law;

(b) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

(c)     Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

(d)     Plaintiff be awarded a trial by jury; and

(e)     Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on August 12, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

/s/ *Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile